## REAL ESTATE PURCHASE AGREEMENT

THIS REAL ESTATE PURCHASE AGREEMENT (this "Agreement") is made and entered into as of the Effective Date (hereinafter defined) by and between VISITORS' PLAZA, INC., a Florida corporation ("Seller"), and Treasure Island Real Estate Partners, LLC, a Florida limited liability company ("Purchaser").

### WITNESSETH:

WHEREAS, Seller is the fee simple owner of certain real property located in Osceola County, Florida, as more particularly described on **Exhibit "A"** attached hereto and made a part hereof (the "Real Property") and upon which is located commercial structures and related facilities and amenities;

WHEREAS, Seller is the holder of an easement benefiting certain real property adjacent to the Real Property and located in Osceola County, Florida, pursuant to that certain Easement recorded March 16, 2000 in Official Records Book 1714, Page 2557 of the Public Records of Osceola County, Florida (the "Easement");

WHEREAS, Seller is the grantor of that certain January 1, 1995 Sign Easement to Gator Outdoor Advertising, Inc. or its successor and assigns, recorded in the Official Records of Osceola County, Florida at Book 1269 and Page 0384 ("Sign Easement");

WHEREAS, Seller is the landlord under that certain April 5, 2014 Lease Agreement to Triple F Entertainment, LLC, Inc. or its successor and assigns, ("Triple F Lease") for the lease of the premises formerly known as the Sizzlin Grill ("Sizzlin Lease");

WHEREAS, Seller is the landlord under that certain December 1, 2003 Lease to KMA Trading USA, Inc. or its successor and assigns, for the lease of the premises located at Units 5817 and 5819 ("KMA Lease");

WHEREAS, Seller is the landlord under those certain leases to various parties for the lease of units or stalls located at the Property ("Flea Market Leases");

WHEREAS, the Property (as defined herein) is managed by Visitors Flea Market, LLC ("Manager") pursuant to a Management Agreement between Seller and Manager; and

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase from Seller, the Property (as hereinafter defined) upon the terms and conditions hereinbelow set forth in this Agreement.

NOW, THEREFORE, for and in consideration of the covenants, terms, and agreements set forth herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby expressly acknowledged by the parties hereto, Purchaser and Seller (collectively referred to as "Parties" or individually and interchangeably as "Party") hereby covenant and agree as follows:

EXHIBIT "A"

1.    <u>Agreement to Buy and Sell</u>. Seller agrees to sell to Purchaser and Purchaser agrees to purchase from Seller the following, subject to the terms and conditions set forth in this Agreement:

The Real Property together with all rights, privileges and easements appurtenant thereto, including, without limitation, (i) all buildings, structures, and improvements located on the Real Property and any and all of Seller's rights, easements, licenses and privileges presently thereon or appertaining thereto; (ii) Seller's right, title, and interest, if any, in and to any land lying in the bed of any street, alley, road or avenue (whether open, closed or proposed) within, in front of, behind or otherwise adjoining the Real Property or any of it; (iii) all appliances, furniture, furnishings, fixtures, equipment, tools, booklets, manuals, supplies, and other tangible property owned by Seller and located on the Real Property; (iv) all right, title, and interest of Seller under any and all of the maintenance, service, advertising, and other like contracts and agreements with respect to the ownership and operation of the Property (collectively, the "<u>Service Contracts</u>") that Purchaser chooses to assume pursuant to the terms of this Agreement; all to the extent applicable to the period from and after the Closing (as hereinafter defined); (v) all right, title, and interest of Seller under any and all of the leases and rental agreements currently in effect at the Property and related deposits, including but not limited to, the Sign Easement, Sizzlin Lease, KMA Lease, and Flea Market Leases all amendments, modifications, extensions, or addendums thereto (collectively, the "<u>Leases</u>"); (vi) Seller's right, title, and interest in and to all intangible personal property relating to the Property, including but not limited to, the rights, title, interest, to the use of the term "Visitor's Plaza", "Visitor's Flea Market", "Visitor's Market" and all other related or associated trademarks, tradedress, copyrights, and marks; (vii) zoning entitlements, development rights, and appurtenances accruing to the Real Property, and/or related to the proposed development thereof, under, or by reason of, any applicable zoning ordinance or other law, rule, regulation, or ordinance (but not any impact fees); and (viii) any and all of Seller's right, title, and interests in and to the Easement (items (i) through (viii) above, together with the Real Property, are collectively referred to in this Agreement as the "<u>Property</u>").

2.    <u>Earnest Money</u>.

(a)    Within two (2) business days after the Effective Date, Purchaser shall deposit Fifty Thousand and No/100 Dollars ($50,000.00) (the "<u>First Deposit</u>") which First Deposit will be held in escrow by Fassett, Anthony & Taylor, P.A. ("<u>Escrow Agent</u>").

(b)    Within one (1) business day after the expiration of the Inspection Period, Purchaser shall deposit, in escrow, with Escrow Agent, the sum of One Hundred and Fifty Thousand and No/100 Dollars ($150,000.00) (the "<u>Second Deposit</u>") (the First Deposit and the Second Deposit are hereinafter collectively referred to as the "<u>Deposits</u>").

(c)    Failure by Purchaser to timely make either the First Deposit or Second Deposit shall result in the automatic termination of this Agreement and any funds deposited by Purchaser on the date of termination shall be refunded to Purchaser.

(d)    The Deposits shall be non-refundable and fully "at risk" upon the expiration of the Inspection Period, subject only to the terms of this Agreement.

(e)     The Deposits shall be held and disbursed by the Escrow Agent in accordance with the provisions of this Agreement. At Closing (as defined herein below), the Deposits shall be credited against the Purchase Price (as defined herein below).

(f)     The provisions of this Section 2 shall survive the termination of this Agreement.

3.     Purchase Price. The total purchase price to be paid by Purchaser to Seller for the Property (the "Purchase Price") shall be Five Million One Hundred Thousand and No/100 Dollars ($5,100,000.00). Purchaser acknowledges and agrees that the Purchase Price reflects Purchaser's acceptance of the Property, including, without limitation, Seller's interests in the Easement, in "As Is" condition as more particularly set forth in this Agreement, and the Purchase Price is not subject to adjustment at any time with respect to any extensions, renewals, or modifications of the Easement occurring on or after the Closing Date.

4.     Information Relating to Property. Within five (5) days after the Effective Date, Seller shall provide to Purchaser, to the extent that Seller has possession of or can reasonably obtain possession of such, copies of the following documents and information related to the Property (the "Property Information"):

(a)     the Easement;

(b)     all current Leases;

(c)     the contract for the lease or use of the billboard on the Property ("Billboard Lease") and all amendments, modifications, extensions, or addendums thereto;

(d)     all existing engineering and condition reports dated within five (5) years prior to the Effective Date;

(e)     all environmental studies and reports dated within five (5) years prior to the Effective Date;

(f)     all advertising and/or marketing contracts related to the Property, including but not limited to, all agreements to advertise on billboards;

(g)     the most recent survey and site plan for and of the Property;

(h)     Seller's most recent title insurance policy;

(i)     the income and expenses statements for the Property for the prior two years;

(j)     a tenant and rent matrix identifying: (1) all current tenants by name, contact person, and address (the "Tenants"), (2) location of leased premises, (3) amount of deposit held by Seller, (4) amount of monthly rent paid or terms upon which the monthly rent is calculated, (5) dates of rent payments and delinquencies for each tenant for the last twelve (12) months; and

(k)     all Service Contracts and other contracts and agreements that will survive Closing.

5.     Due Diligence.

(a)     Inspection of Property. During the sixty (60) day period following the Effective Date (the "Inspection Period"), Purchaser and Purchaser's consultants and agents may undertake and complete such inspections of the Property as Purchaser and Purchaser's consultants and agents deem necessary or appropriate, including, without limitation:

(i)     The physical condition of the Property;

(ii)     A determination and review of governmental laws, ordinances and regulations affecting the present and future use of the Property;

(iii)     A determination of the existence of any Hazardous Substance (as hereinafter defined) or any other environmental risk, on, in or under the Property. Purchaser, at its own cost and expense, shall be responsible for obtaining any desired environmental assessment, audit, or testing regarding the Property, which assessment(s), audit(s) or testing shall be completed within the Inspection Period;

(iv)     A review of such other matters relating to the Property as Purchaser may deem appropriate, including market studies and suitability for Purchaser's intended investment purposes.

(b)     During the Inspection Period, Seller shall: (i) provide Purchaser and Purchaser's consultants and agents with such access to the Property as is reasonably necessary to carry out Purchaser's inspections, and (ii) otherwise make reasonable efforts to cooperate with Purchaser's inspection. Purchaser shall provide Seller with not less than forty-eight (48) hours notice prior to any desired inspection and neither Purchaser nor Purchaser's consultants and agents shall contact or provide any information regarding the sale of the Property to any of Seller's tenants without Seller's prior written approval. Seller may, at Seller's sole and absolute discretion, have an employee, agent, or other representative present during any inspection conducted by Purchaser or Purchaser's agents or consultants.

(c)     In the event that Purchaser performs (or causes to be performed) any drilling or boring or other invasive testing on the Property, Purchaser, upon conclusion of any such invasive testing, shall promptly restore the Property (or portions thereof) so disturbed to substantially the same condition as it existed immediately prior to any such invasive testing. Purchaser hereby agrees that prior to any entry upon the Property by Purchaser or any third party pursuant to the authority granted by this Agreement, Purchaser shall deliver or cause to be delivered to Seller by any such third party a Certificate of Insurance evidencing public liability insurance from an "A" rated insurance carrier, in an amount not less than One Million and No/100 Dollars ($1,000,000.00) per incident or person and not less than Two Million and No/100 Dollars ($2,000,000) per claim and such insurance shall be maintained in force during any period during the term of this Agreement that Purchaser or any such third party enters upon the Property pursuant to this Agreement. Purchaser shall also deliver or cause to be delivered to Seller prior to any third party entry upon the Property, such third party's contractor's license or

the equivalent thereof and proof of workers' compensation insurance carried by such third party which shall be maintained in force during any period during the term of this Agreement that any such third party enters upon the Property. Purchaser shall pay and be solely liable for all costs and expenses incurred in connection with its investigations, tests and inspections of the Property provided, however, that Purchaser shall have no responsibility for costs of Seller related to the discovery by Purchaser of any pre-existing condition. Purchaser shall keep the Property free and clear of any liens and will indemnify, defend, and hold Seller harmless from all claims and liabilities for any liens and for damage to property or injury to persons asserted against Seller as a result of any such entry by Purchaser, its agents, engineers, contractors, employees or representatives, provided that Purchaser shall not be liable to Seller for any diminution in the value of the Property resulting from the discovery of any pre-existing condition. In the event any liens are filed against the Property as a result of Purchaser's investigation thereof, Purchaser shall cause such liens to be removed or satisfied or have such liens transferred to bond within fifteen (15) days after Purchaser receives written notice of such liens. The failure of Purchaser to satisfy any such lien filed against Seller or the Property or to have such lien transferred to bond within the aforementioned fifteen (15) day period shall constitute a default by Purchaser under this Agreement. If any inspection or test disturbs or damages the Property, Purchaser will restore the Property to substantially the same condition as existed prior to any such inspection or test. Purchaser's and Seller's obligations under this Section 5(c) shall survive the Closing and any termination of this Agreement.

        (d)    Purchaser acknowledges and agrees that it is accepting the Due Diligence Materials and other documents with the understanding that, as to third party reports, the information therein has been compiled by persons and entities other than Seller, and Seller has not verified and does not independently certify that the information contained therein is true, correct, or complete in all respects. With respect to any reports issued by third Parties, Purchaser further acknowledges and agrees that it understands and has been informed by Seller that Seller has not and does not adopt or ratify the findings of the third-Party consultants who prepared such third-Party reports, does not represent that such third-Party reports are accurate in any respect, and does not warrant or represent that such third-Party reports can or should be relied upon by Purchaser in making its investment decisions concerning the Property. Although Seller is willing to cooperate with Purchaser in connection with its due diligence activities and will instruct Seller's employees (if any), agents, contractors, and investment advisors to cooperate with Purchaser and its agents, contractors, and consultants, Seller is unwilling to sell the Property to Purchaser unless there is a clear understanding between the Parties that Seller will not have any liability with respect to any opinions, statements, warranties, representations, or other information furnished to Purchaser by such employees, agents, contractors, and investment advisors, unless expressly incorporated in this Agreement as Seller's representations. Accordingly, Purchaser releases and discharges Seller from any and all damage, injury, or loss suffered by Purchaser as a result of: (a) any and all such statements, information, opinions and other matters furnished by such employees, agents, contractors, and investment advisors of Seller, except to the extent expressly incorporated in this Agreement as a representation of Seller, and (b) any omission to disclose information or withholding of information by any such employees, agents, contractors, and investment advisors of Seller, unless done at the express direction of an officer of Seller or unless Seller had knowledge thereof, and Purchaser was not aware of such omission or withholding.

(e)      In the event that Purchaser, during the Inspection Period, determines in its sole and absolute discretion for any reason, or for no reason at all, that it does not intend to acquire the Property, Purchaser shall notify Seller in writing prior to the expiration of the Inspection Period, whereupon Escrow Agent shall refund the Deposits to Purchaser and all rights and obligations of the Parties contained herein shall cease and terminate and this Agreement shall be null and void except for such rights and obligations which are expressly stated herein as surviving termination. In the event Purchaser fails to notify Seller of such termination prior to the expiration of the Inspection Period, Purchaser shall be deemed to have accepted the Property as is subject to the Seller's representations, warranties, and covenants herein, and the Deposits shall be nonrefundable, except for Seller default or as provided elsewhere in this Agreement.

(f)      If this Agreement is terminated for any reason, Purchaser shall return all Property Information to Seller and shall deliver to Seller copies of all investigative reports, surveys, and studies related to the Property created by or obtained from third Parties prior to the date of termination; provided, however, that Purchaser shall not be required to deliver any information that is considered by Purchaser to be proprietary or confidential, or is subject to attorney/client privilege or attorney work-product privilege. Such information shall be provided without any representation, warranty, or assurance of any kind by Purchaser, including, without limitation, with respect to the accuracy or completeness thereof. This paragraph 5(f) shall survive the termination of this Agreement.

6.      Title Matters; Survey; Pre-Closing Matters.

(a)      Title Insurance. Within three (3) days after the Effective Date, Seller shall provide Purchaser, at Seller's cost, with a current title insurance commitment for an ALTA Form B Owner's Policy of Title Insurance (2006) with Florida modifications (the "Title Commitment") and copies of all exceptions referred to therein from First American Title Insurance Company, issued to Shutts & Bowen, LLP, as agent (the "Title Company"). Purchaser acknowledges and agrees that the Title Commitment may be updated to reflect the lien of taxes and assessments for the year of Closing.

(b)      Title Objection. Within fifteen (15) days of receiving the Title Commitment, Purchaser shall provide Seller with written notice of any matters in the Title Commitment that, in Purchaser's sole opinion, will prevent Seller from conveying marketable title to the Property to Purchaser at Closing free and clear of any liens or encumbrances (hereinafter collectively referred to as the "Objections") in which case, Seller shall have ten (10) days after receipt of the Objections to attempt to cure the Objections ("Title Cure Period") and inform Purchaser in writing of whether the Objections have been cured; provided, however, that Seller will have no obligation to cure any Objections. If Seller fails to cure the Objections within the Title Cure Period, Purchaser shall have ten (10) business days after the expiration of the Title Cure Period to inform Seller in writing that it will either terminate this Agreement and receive a refund of the Deposits, or proceed with the Closing subject to this Agreement in which event such Objections shall be waived by Purchaser.

(c)      Delivery of Title Policy at Closing. At the Closing, the Title Company shall deliver to Purchaser an ALTA Form B Owner's Policy of Title Insurance (2006) with Florida modifications ("Title Policy") issued by the Title Company with ALTA General

Exceptions 1 through 5 deleted (except for matters reflected on a survey), dated the date and time of the recording of the Deed in the amount of the Purchase Price, insuring Purchaser's fee simple title to the Property. Purchaser shall have the right to request endorsements to the Title Policy, at Purchaser's sole cost and expense and to the extent the same are available in Florida, provided, however, the Title Company's agreement to issue any such endorsement shall not be a condition to, or otherwise effect, Purchaser's obligation to close this transaction except as expressly provided in Section 6(b) above. The Title Policy may be delivered after the Closing if at the Closing the Title Company issues a currently effective, duly-executed "marked-up" Title Commitment and irrevocably commits in writing to issue the Title Policy in the form of the "marked-up" Title Commitment promptly after the Closing Date.

        (d)    Survey. Within thirty (30) days after the Effective Date, Purchaser may obtain a Survey of the Property. Within ten (10) days after the receipt of the Survey ("Survey Objection Period"), if Purchaser is not satisfied with the Survey, Purchaser may either: (1) terminate this Agreement within the Survey Objection Period and receive a refund of the Deposits, in which case, neither Party will have any further rights or obligations regarding this Agreement or the Property, except for obligations which specifically survive termination of this Agreement, as provided herein, or (2) inform Seller in writing of any Survey defects or objections ("Survey Objections") to the form and/or contents of the Survey, in which case, Seller shall have ten (10) days after receipt of the Survey Objections to attempt to cure the Survey Objections ("Survey Cure Period") and inform Purchaser in writing of whether the Survey Objections have been cured; provided, however, that Seller will have no obligation to cure any Survey Objections. If Seller fails to cure the Survey Objections within the Survey Cure Period, Purchaser shall have five (5) business days after the expiration of the Survey Cure Period to either terminate this Agreement and receive a refund of the Deposits or proceed with the Closing subject to this Agreement in which event such Survey Objections shall be deemed Permitted Encumbrances.

        (e)    Service Contracts. Purchaser shall, within thirty (30) days after the Effective Date, notify Seller as to which of the Service Contracts, if any, Purchaser does not desire to acquire at Closing. Thereafter, at or before the Closing, Seller shall terminate all such Service Contracts that Purchaser does not desire to acquire which Service Contracts are terminable without cause or terminable by Seller without Seller incurring any liability. Seller shall deliver an assignment of all other remaining Service Contract at Closing. Seller shall indemnify and hold Purchaser harmless for any claim against Purchaser or the Property arising out of the rejected Service Contracts.

        (f)    Seller Actions. During the term of this Agreement, Seller shall: (a) advise Purchaser promptly of any litigation, arbitration, or administrative hearing before any court or governmental agency concerning or affecting the Property which is legally served on the Seller after the Effective Date; (b) pay or cause to be paid all taxes, assessments, and other governmental impositions levied or assessed on the Property or any part thereof prior to the delinquency date, and comply with, respond to, or otherwise cure any violations of all federal, state, and municipal laws, ordinances, regulations, and orders relating to the Property by an applicable governmental authority that Seller becomes aware of; and (c) not create or permit to exist any lien or encumbrance (other than the matters existing on the Effective Date hereof) on the Property or any portion thereof that is not terminable without fee with thirty (30) days prior notice. Notwithstanding anything in this Agreement to the contrary, Seller shall be under no

obligation to repair, replace, or maintain the Property except if: (i) such repair, replacement, or maintenance is required to cure a violation of any applicable building code, ordinance, or similar regulation; and (ii) Seller's costs of such repair, replacement, or maintenance does not exceed Thirty Thousand and No/100 ($30,000).

(g)      Maintenance of Property through Closing. Between the Effective Date and the Closing, Seller will:

A,      Maintain the Property substantially in its present condition, subject to normal wear and tear, and operate (subject to the provisions below) the Property in its present manner until Closing, subject to the rights and obligations of the Tenants under the Leases.

B.      Maintain the current insurance policies (or renewals thereof) in full force and effect until the Closing.

C.      Operate the Property and manage the Tenants and Leases in the ordinary and customary course of business, and shall not execute or commit to any usual or significant lease terms or extension without the consent of Purchaser.

7.      Conditions to the Parties' Obligations to Close. In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder shall be contingent upon the following conditions precedent to Closing:

(a)      The other Party's representations and warranties expressly stated in this Agreement shall be true and correct as of the Effective Date of this Agreement and the Closing Date. For purposes of this clause (a), if a representation is made to knowledge, but the factual matter that is the subject of the representation is false notwithstanding any lack of knowledge or notice to the Party making the representation, such event shall constitute a failure of this condition only, and not a default by the Party making such representation or warranty;

(b)      As of the Closing Date, the other Party shall have performed its obligations hereunder in all material respects and all deliveries to be made at Closing have been tendered; and

(c)      As a condition to Purchaser's obligation to close, the Title Company shall issue (or be irrevocably committed to issue) the Title Policy.

(d)      Purchaser acknowledges and agrees that Seller's obligation to close is contingent upon: (i) Seller obtaining approval of the owners of one hundred percent (100%) of the shares of stock of Seller (voting and non-voting) approving of the sale and transfer of the Property, or an order from the appropriate court in that case styled *In re; The Estate of Delroy W. Josephs a/k/a Joe Josephs, Case No. 2013-CP-002595* in the Circuit Court of Orange County, Florida, Probate Division, approving of the sale and transfer of the Property; and (ii) Seller satisfying all conditions set forth in that certain Delroy W. Josephs Living Trust, originally dated August 12, 1992, and as amended and restated, necessary for the conveyance and transfer of the

Property. In the event any approval required pursuant to this Section 7(d) is not obtained by Seller prior to Closing, Seller may terminate this Agreement and in which event the Deposits will promptly be returned to Purchaser and neither Party will have any further rights or obligations under this Agreement, except for such as specifically survive termination.

(e)    If any condition to Purchaser's obligation to proceed with the Closing hereunder, excluding Section 7(d) above, has not been satisfied as of the Closing Date, Purchaser may, in its sole discretion: (i) terminate this Agreement by delivering written notice to the other Party on or before the Closing Date and receive a refund of the Deposits; or (ii) elect to consummate this transaction without any adjustment to the Purchase Price, notwithstanding the non-satisfaction of such condition, in which event such Party shall be deemed to have waived any such condition. Notwithstanding the foregoing, prior to exercising the termination option in clause (i) above, Purchaser shall provide Seller with written notice of each condition that has not been satisfied together with an opportunity for a period of ten (10) days to satisfy the outstanding condition(s), which may, if applicable, extend the Closing Date. If each condition has not been satisfied within such ten (10) day period, then the Agreement shall be deemed terminated as provided in clause (i) above. In the event Purchaser elects to close, notwithstanding the non-satisfaction of such condition, there shall be no liability on the part of Seller for breaches of representations and warranties of which Purchaser had actual knowledge at the Closing.

8.    Closing Date and Closing Procedures and Deliveries.

(a)    Closing Date. The closing date (the "Closing Date") for the purchase of the Property shall be on or before that date which is fifteen (15) days after the expiration of the Inspection Period. Purchaser may elect to extend the Closing Date for one (1) period of fifteen (15) days by: (a) notifying Seller in writing at least two (2) business days prior to the then-scheduled Closing Date of the election by Purchaser to extend the Closing Date for an additional fifteen (15) days, and (b) simultaneously therewith delivering to Seller an extension fee of Twenty-Five Thousand Dollars ($25,000.00) ("Extension Fee"). The Extension Fee shall be non-refundable (except in the event of a failure to close by Seller), but shall be applied as a credit against the Purchase Price at Closing, and shall not be deemed additional Earnest Money.

(b)    Closing. The consummation of the transaction contemplated herein ("Closing") shall occur on the Closing Date at the offices of Shutts & Bowen, LLP, 300 S. Orange Avenue, Suite 1000, Orlando, Florida 32801, as agent for Title Company (the "Closing Agent"). Upon satisfaction or completion of all closing conditions and deliveries of the Closing documents and payment of the Purchase Price, the Closing Agent shall immediately record and/or deliver the closing documents to the appropriate Parties and make disbursements according to the closing statements executed by Seller and Purchaser.

(c)    Seller's Deliveries in Escrow. On or before the Closing Date, Seller shall deliver in escrow to the Closing Agent the following:

(i)    Deed. A Special Warranty Deed in the form attached hereto as **Exhibit "D"** and incorporated as part hereof by this reference, executed and acknowledged by Seller, conveying to Purchaser fee simple title to the Property, subject only to the permitted exceptions listed in the Special Warranty Deed (the "Deed").

(ii)     Assignment and Assumption of Personal Property. Two (2) counterparts of an assignment and assumption agreement in the form attached hereto as **Exhibit "E"** and incorporated as a part hereof by this reference (the "Assignment of Personal Property"), executed and acknowledged by Seller, in order to fully and completely transfer and assign to Purchaser all of Seller's right, title, and interest in and to the Personal Property, if any.

(iii)     FIRPTA. A Foreign Investment in Real Property Tax Act affidavit executed by Seller in the form of **Exhibit "F"** attached hereto and incorporated as a part hereof by this reference.

(iv)     Owner's Affidavit. An Owner's Affidavit executed by Seller in the Form of **Exhibit "G"** attached hereto and incorporated as a part hereof by this reference.

(v)     Authority. Evidence of the existence, organization, and authority of Seller and the authority of the person executing documents on behalf of Seller reasonably satisfactory to Closing Agent and the Title Company.

(vi)     Assignment of Easement. Two (2) counterparts of an assignment and assumption of the Seller's rights and obligations under the Easement in the form attached hereto as **Exhibit "H"** and incorporated as a part hereof by this reference (the "Assignment of Easement"), executed and acknowledged by Seller and Purchaser, in order to fully and completely transfer and assign to Purchaser all of Seller's rights, interests, and obligations under the Easement.

(vii)     Assignments of Leases. Two (2) counterparts of an Assignment and Assumption of Leases in the form attached hereto as **Exhibit "I"** and incorporated as a part hereof by this reference ("Assignment of Leases"), executed and acknowledged by Seller and Purchaser, in order to fully and completely transfer and assign to Purchaser all of Seller's rights, interests, and obligations under the leases in effect at the Property (the "Leases").

(viii)     Termination of Management Agreement. A termination of the Management Agreement executed by both Seller and Manager.

(ix)     Additional Documents. Any additional documents that Closing Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

(d)     Purchaser's Deliveries in Escrow. On or before the Closing Date, Purchaser shall deliver in escrow to the Closing Agent the following:

(i)     Purchase Price. The Purchase Price, less the Deposits, and plus or minus applicable prorations, deposited by Purchaser with the Closing Agent in immediate, same-day federal funds wired for credit into the Closing Agent's escrow account.

(ii)     Two (2) counterparts of the Assignment of Personal Property executed and acknowledged by Purchaser.

(iii)   Two (2) counterparts of the Assignment of Easement executed and acknowledged by Purchaser.

(iv)   Two (2) counterparts of the Assignment of Leases executed and acknowledged by Purchaser.

(v)   Tenant Notice Letters. Notice to all tenants in the form attached hereto as **Exhibit "J"** and incorporated as part hereof by this reference to each tenant under the Leases.

(vi)   Additional Documents. Any additional documents that Closing Agent or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

(e)   Closing Statements. At Closing, Seller and Purchaser shall execute and deliver to the Closing Agent a Closing Statement consistent with this Agreement in a form reasonably required by the Closing Agent and acceptable to Seller and Purchaser.

(f)   Title Policy. The Closing Agent shall deliver to Purchaser the Title Policy.

(g)   Possession. Seller shall deliver exclusive possession of the Property to Purchaser at the Closing.

9.   Prorations.

(a)   Proration of Taxes and Assessments. Purchaser shall receive a credit for any accrued but unpaid real estate taxes and any assessments imposed on the Property including without limitation, any assessments imposed by private covenant ("Taxes") applicable to any period before the Closing Date, even if such Taxes are not yet due and payable. If the amount of any Taxes has not been determined as of Closing, such credit shall be based on the most recent ascertainable Taxes. Purchaser shall receive a credit for any certified special assessments which are levied or charged against the Property, whether or not then due and payable; provided, however, if any such special assessments are payable in installments, only the installments applicable to any period before the Closing Date shall be adjusted hereunder (and either paid by Seller or credited to Purchaser to the extent unpaid or credited to Seller to the extent prepaid), and Purchaser shall assume the obligations for all installments applicable to any period after the Closing. Any pending special assessments as of the Closing Date shall be assumed by Purchaser. Seller shall receive a credit for the portion of any Taxes that have been prepaid with respect to any period on or after the Closing Date. Purchaser shall be responsible for all Taxes relating to the day of Closing.

(b)   Documentary Stamp Taxes. Documentary stamp taxes imposed and payable in connection with the execution, delivery and recording of the Deed shall be paid by Seller at Closing.

(c)   Recording Fees/Title. Seller shall pay the cost to record the Deed, and Seller shall pay the cost to record any corrective instruments relating to Title Defects, to the

extent Seller elects to cure any such Title Defects. Seller shall pay the base premium for the Title Policy and any search fees. Purchaser shall pay for any endorsements to the Title Policy.

(d)    Commissions. Seller and Purchaser represent and warrant each to the other that, except as otherwise set forth in this paragraph, they have not dealt with any real estate broker, sales person or finder in connection with this transaction. Seller shall indemnify Purchaser against, and hold the Purchaser harmless from, any liability or claim (and all expenses, including reasonable attorney's fees incurred in defending any such claim or in enforcing this indemnity) for a real estate brokerage commission or similar fee or compensation asserted by any real estate broker, sales person or similar finder and arising out of or in any way connected with any claimed dealings with the Seller relating to this Agreement or the purchase and sale of the Property. Purchaser shall indemnify Seller against, and hold the Seller harmless from, any liability or claim (and all expenses, including reasonable attorney's fees incurred in defending any such claim or in enforcing this indemnity) for a real estate brokerage commission or similar fee or compensation asserted by any real estate broker, sales person or similar finder and arising out of or in any way connected with any claimed dealings with the Purchaser relating to this Agreement or the purchase and sale of the Property. Seller shall be solely responsible for payment of commissions to Hold Thyssen, Inc., per the terms and conditions of the agreement regarding the payment of such commissions by and between Seller and Hold Thyssen, Inc.

(e)    Rent. All rent and other sums payable by tenants under the Leases shall be prorated as of the Closing Date; provided, however, that rental and all other sums which are due and payable to Seller by any tenant but uncollected as of the Closing Date (collectively, the "Delinquent Accounts") shall not be adjusted, but Purchaser shall cause a prorated amount of such Delinquent Accounts to be remitted to Seller if, as and when collected. At Closing, Seller shall deliver to Purchaser a schedule of all such Delinquent Accounts. Purchaser shall use commercially reasonable efforts to collect such Delinquent Accounts; provided, however, nothing in this Section 9(e) shall prevent Seller from instituting any legal action deemed necessary or desirable by Seller to collect such Delinquent Accounts.

(f)    Utilities. All water, electric, telephone, sewer, gas, cable television, if any, and other utility and fuel charges shall be prorated as of the Closing Date; provided, however, that any deposits with utility companies shall remain the property of Seller and shall not be prorated or credited (to the extent possible, utility prorations will be handled by meter readings on the day immediately preceding the Closing Date).

10.    Warranties and Representations of Seller. To induce Purchaser to enter into this Agreement and to purchase the Property, Seller, as of the Closing Date and in addition to the other representations and warranties set forth herein, makes the following representations and warranties, each of which shall survive Closing pursuant to the terms set forth below.

(a)    Seller has been duly organized and is validly existing and in good standing under the laws of Florida, and has the full power and authority to enter into this Agreement and perform its obligations and consummate the transactions contemplated under this Agreement.

(b)    This Agreement and all documents executed and delivered by Seller under this Agreement, are, or at the time of Closing will be, duly authorized, executed, and delivered

by Seller and constitute the legal, valid, and binding obligations of Seller. Such documents do not violate any provisions of or cause a default under any agreement, instrument, or judicial order to which Seller is a Party or by which Seller or the Property are bound.

      (c)     Neither Seller nor the owner of any controlling interest in Seller:

      (i)     is listed on the Specially Designated Nationals and Blocked Persons List maintained by the office of Foreign Assets Control, Department of the Treasury ("OFAC") pursuant to the Executive Order No. 13224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to the Order and any other applicable rules, regulations, legislation or orders (such lists are collectively referred to as the "Lists"); or

      (ii)     will transfer or permit the transfer of any controlling interest in Seller to any person or entity who is, or any of whose beneficial owners are, listed on the Lists.

      (d)     To Seller's actual knowledge (and without independent investigation) no hazardous substances, hazardous waste, Hazardous Materials, or pollutants have been generated, released, stored, used or deposited at, over, beneath or upon the Property.

      (e)     Seller has not received any written notice and Seller has no knowledge of any claims related to or violations of Environmental Requirements.

      (f)     No other person or entity has any right or option that has not been waived to purchase or acquire all or any part of the Property.

      (g)     Seller has not received any written notice and Seller has no knowledge of any lawsuits or administrative proceedings pending or threatened against Seller or the Property or directly concerning the Property.

      (h)     Seller has not received any written notice and Seller has no knowledge of any condemnation or eminent domain proceedings pending or threatened concerning the Property, and Seller has received no notice from any governmental or quasi-governmental agency or authority or potential condemnor concerning any right-of-way, utility, or other taking which may affect the Property.

      (i)     Seller has received no written notice of any pending or threatened mechanics' or materialman's liens against the Property that will not be satisfied or eliminated at or prior to Closing. Sellers have paid or will pay prior to the Closing Date for all labor and other services that have been or may be performed and all materials that have been or may be furnished prior to the Closing Date to improve any part of the Land, the non-payment of which would give rise to the right to file a mechanic's or materialman's lien

      (j)     With regard to any violation that would have a material and adverse impact against the Property, Seller has received no written notice from any government, agency, body or subdivision thereof, or any employee or official thereof, stating that the Property violated or is violating, any law, ordinance, rule, regulation, order or standard, including without

limitation those relating to zoning, building, fire, health, safety, environmental control and protection, and access, or that any investigation has been commenced or is contemplated respecting any such possible violation, and Seller has no actual knowledge of any such violation or investigation.

Each of Seller's representations and warranties contained in this Agreement is limited, modified, and expressly conditioned as follows: (a) a representation or warranty shall be of no effect to the extent Purchaser had actual knowledge at the time of Closing that such representation or warranty was untrue or inaccurate; (b) each representation and warranty is made for the exclusive benefit of Purchaser and any permitted assignee of Purchaser hereunder; and (c) the reference to Seller's knowledge refers only to the actual knowledge of Delroy Josephs, Jr. or Millicent Beth Coban, without independent investigation and without any duty to investigate, and the knowledge of other people employed by or connected with Seller cannot be the basis for any violation of a representation or warranty. Seller's representations and warranties in subsections (a), through (f) above shall remain in perpetuity, but Seller's representations and warranties in subsections (g) through (j) above shall survive for a period of one (1) year following Closing (the "Representation Period"). Any claim (that is limited by the Representation Period) that Purchaser may have at any time against Seller for a breach of any representations and warranties with respect to which Purchaser has delivered written notice to Seller on or prior to the expiration of the Representation Period may be the subject of subsequent litigation brought by Purchaser against Seller, provided that such litigation is commenced against Seller within the statute of limitations period applicable to such claim. In no event will the aggregate liability of Seller for any breaches or inaccuracies of Seller's representations or warranties given hereunder exceed One Hundred Thousand and No/100 Dollars ($100,000). If Purchaser, with actual knowledge of any breach of or inaccuracy of the surviving representations, nonetheless elects to proceed to Closing, then, upon the consummation of Closing, Purchaser shall be deemed to have waived any such default and/or breach or inaccuracy and shall have no claim against Seller with respect thereto. In the event that any of the representations and warranties stated herein are breached prior to Closing, but Purchaser does not discover such breach until after Closing, such breach shall be deemed a post-Closing breach.

11.    Change in Circumstances. If Seller becomes aware of information or facts or if circumstances arise between the Effective Date and Closing which would make any of the above Seller's representations and warranties untrue or inaccurate ("Change"), Seller shall notify Purchaser in writing within three (3) business days of becoming aware of such facts or circumstances and provide copies of relevant documents related thereto and Purchaser shall have five (5) business days to elect the option of: (1) accepting such Change and proceed with this Agreement, (2) terminating this Agreement and receiving a return of all Deposits, or (3) notifying Seller of Purchaser's desire to have the Change cured, in which case, the Parties shall work together to cure the Change and if the cure cannot be accomplished within thirty (30) days, then Purchaser shall once again have the option of: (1) accepting such Change and proceed with this Agreement, or (2) terminating this Agreement and receiving a return of all Deposits. If Purchaser elects to accept a Change and proceed with this Agreement, Purchaser waives any claim based on the Change.

12.     Purchaser's Representations and Warranties. To induce Seller to enter into this Agreement and to sell the Property, Purchaser makes the following representations and warranties, each of which shall survive Closing:

(a)     Purchaser has been duly organized and is validly existing and in good standing under the laws of the state of Florida, and will as of Closing be qualified to do business in Florida. Purchaser has the full power and authority to enter into this Agreement, and perform its obligations and consummate the transactions contemplated by this Agreement.

(b)     This Agreement and all of the documents to be delivered by Purchaser at the Closing have been and will be duly authorized, executed and delivered and will constitute the legal, valid and binding obligations of Purchaser, enforceable in accordance with their terms.

(c)     There is no agreement to which Purchaser is a Party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement. There is no action or proceeding pending, or to Purchaser's knowledge threatened, against Purchaser which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

(d)     Neither Purchaser nor the owner of any controlling interest in Purchaser:

(i)     is listed on the Lists; or

(ii)     will transfer or permit the transfer of any controlling interest in Purchaser to any person or entity who is, or any of whose beneficial owners are, listed on the Lists.

Purchaser hereby covenants and agrees that if Purchaser obtains knowledge that Purchaser or any owner of any controlling interest in Purchaser becomes listed on the Lists or is indicted, arraigned, or detained on charges involving money laundering or predicate crimes to money laundering, Purchaser will immediately notify Seller in writing, and in such event, Seller will have the right to terminate this Agreement without penalty or liability to Seller immediately upon delivery of written notice thereof to Purchaser, in which event the Deposits will promptly be returned to Purchaser and neither Party will have any further rights or obligations under this Agreement, except for such as specifically survive termination.

13.     Connection Fees. Purchaser shall be solely responsible for all tap-in charges, connection fees, service charges, transportation/road impact fees, contributions in aid of construction and the like for sewer, water, gas, electric (including underground electric service connection charges), and telephone service insofar as the aforesaid relate to the further development of the Property. Purchaser shall also be solely responsible for all other impact fees and contributions in aid of construction insofar as the aforesaid relate to the further development of the Property. The provisions of this Section 13 shall survive the Closing.

14.     Defaults.

(a)     Seller's Default. Subject to the cure period set forth in subsection (d), in the event Seller fails to comply with or perform any of the conditions to be complied with or any of the covenants, representations, warranties, agreements, or obligations to be performed by

Seller under the terms and provisions of this Agreement prior to Closing, Purchaser, in Purchaser's sole discretion, shall be entitled to: (i) terminate this Agreement and obtain an immediate refund of the Deposits and this Agreement and all rights and obligations created hereunder shall be deemed null and void and of no further force or effect, except for those obligations set forth herein which expressly survive termination of this Agreement; or (ii) in lieu of terminating this Agreement, institute legal proceedings against the Seller for specific performance of this Agreement. Purchaser acknowledges and agrees that prior to Closing, the remedies specified in (i) and (ii) above constitute Purchaser's sole remedies under this Agreement and Purchaser hereby expressly waives any right to seek any direct, compensatory, punitive, special, consequential or indirect damages as a result of Seller's breach of this Agreement prior to Closing. In the event that Seller fails to comply with any of the provisions herein which survive Closing or Purchaser discovers after the Closing that Seller breached any representations or warranties prior to Closing, Purchaser shall be entitled to bring an action for damages and/or injunctive relief for such post-Closing default.

(c)     Purchaser's Default. Subject to the cure period set forth in subsection (d), in the event Purchaser fails to perform at Closing any of the conditions to be complied with or any of the covenants, agreements, representations, warranties, or obligations to be performed by Purchaser under the terms and provisions of this Agreement, Seller's sole and exclusive remedy for such default shall be, upon giving written notice to Purchaser and Escrow Agent as herein provided, to receive the Deposits then paid to and held by Escrow Agent as full liquidated damages, whereupon this Agreement and all rights and obligations created hereby shall automatically terminate and be null and void and of no further force or effect whatsoever. Purchaser and Seller acknowledge that it would be difficult or impossible to ascertain the actual damages suffered by Seller as a result of any default by Purchaser and agree that such liquidated damages are a reasonable estimate of such damages. Notwithstanding the aforementioned and anything contained herein to the contrary, Seller shall be entitled to sue for compensatory damages in connection with any breach of Purchaser's covenants to repair, indemnify, hold harmless, defend and pay in accordance with Section 5(c) above. Purchaser acknowledges and agrees that the reservation of Seller's right to seek compensatory damages above is a material inducement to Seller entering into this Agreement.

(d)     Default Notice. Prior to declaring a default and exercising the remedies described herein, the non-defaulting Party shall issue a written notice of default to the defaulting Party describing the event or condition of default in sufficient detail to enable a reasonable person to determine the action necessary to cure such default. The defaulting Party shall have ten (10) days from delivery of the notice in which to cure such default; provided, however, that in instances in which such cure shall reasonably require more than such ten (10) days, the defaulting Party shall have such extended period (but in no event more than 30 days) to effect such cure as shall be reasonably required, provided such defaulting Party provides notice to the non-defaulting party that it has commenced such cure within such ten (10) day period. However, notwithstanding the foregoing, in no event shall any cure period extend beyond the Closing Date. If the default has not been cured within the foregoing applicable period or prior to the Closing Date, the non-defaulting Party may exercise the remedies for default of the defaulting Party as are described above. Notwithstanding anything contained herein to the contrary, no notice shall be required under this subparagraph for any failure of Purchaser or Seller (as may be applicable) to deliver the Deposits or Purchase Price or to complete the Closing on the Closing Date.

15.    Casualty and Condemnation.

(a)    Casualty. If all or any part of the Property is substantially damaged by fire, casualty, the elements, or any other cause ("Casualty"), Seller shall promptly give written notice to Purchaser ("Casualty Notice"), and Purchaser shall have thirty (30) days after the Casualty Notice ("Casualty Notice Period") to terminate this Agreement and receive a refund of the Deposits by giving written notice to Seller ("Casualty Termination Notice"). If Purchaser fails to give the Casualty Termination Notice within the Casualty Notice Period, then the Parties shall proceed to Closing, and Seller shall assign to Purchaser all rights, interest, and title to all insurance policies and proceeds and all claims, causes of action, and damages resulting from such Casualty and Purchaser shall receive a credit at Closing for the amount of any insurance deductible. Upon Closing, full risk of loss with respect to the Property shall pass to Purchaser and the proceeds of any insurance coverage relating to such Casualty shall be assigned to and transferred to Purchaser at Closing. The Closing Date shall automatically be extended until ten (10) days after the Casualty Notice Period.

(b)    Condemnation. If eminent domain proceedings are threatened or commenced against all or any part of the Property ("Condemnation"), Seller shall promptly give written notice to Purchaser ("Condemnation Notice"), and Purchaser shall have thirty (30) days after the Condemnation Notice ("Condemnation Notice Period") to terminate this Agreement and receive a refund of the Deposits by giving written notice to Seller ("Condemnation Termination Notice"). If Purchaser fails to give the Condemnation Termination Notice within the Condemnation Notice Period, then the Parties shall proceed to Closing, and Seller shall assign to Purchaser all of its rights, interest, and title to appear in and receive any award from such proceedings or to be made by reason of such condemnation and/or reducing the Purchase Price by the amount of any condemnation proceeds paid to Seller prior to Closing. The Closing Date shall automatically be extended until ten (10) days after the Condemnation Notice Period.

(c)    No Settling of Claims. Seller agrees not to settle any Casualty claims or agree to any award or payment in Condemnation or agree to any award or payment in connection with the change in grade of any street, road, highway, or avenue in respect of, or in connection with the Property without obtaining Purchaser's prior consent in each case, not to be unreasonably withheld, conditioned, or delayed.

16.    Notices. All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the addresses set forth below. Any such notices shall be either: (a) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with such courier; (b) sent by personal delivery, in which case notice shall be deemed delivered upon receipt, or if delivery is refused, the date upon which delivery is first refused, or (c) sent by electronic mail transmission with a copy via U.S. First Class Mail. A Party's address may be changed by written notice to the other Party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Notices given by counsel to the Purchaser shall be deemed given by Purchaser and notices given by counsel to the Seller shall be deemed given by Seller.

To Purchaser at the following address:

> Treasure Island Real Estate Partners, LLC
> M. Nadeem Battla
> 9502 Lavill Ct.
> Windermere, FL 34786
> E-Mail: virginhomes@hotmail.com

With a copy to:

> Fassett, Anthony & Taylor, P.A.
> 1325 W. Colonial Drive
> Orlando, FL. 32804
> Attn: Phil D'Aniello, Esq.
> Email: pdaniello@fassettlaw.com

To Seller at the following address:

> Visitors' Plaza, Inc.
> c/o Shutts & Bowen, LLP
> 300 South Orange Avenue, Suite 1000
> Orlando, FL 32801
> Attn: Andrew Bumby, Esq.
> Email: abrumby@shutts.com

With a copy to:

> Shutts & Bowen, LLP
> 300 South Orange Avenue, Suite 1000
> Orlando, Florida 32801
> Attn: Andrew Bumby, Esq.
> Email: abumby@shutts.com

or to such other address as either Party hereto shall from time to time designate to the other Party by notice in writing as herein provided. Notwithstanding any of the foregoing, regardless of the form of delivery or any defect in the manner of delivery, notice shall be deemed to have been given upon the other Party's actual receipt or knowledge of the notice.

17.   Property Sold "AS-IS"; Release; and Indemnity.

(a)    Property Sold "AS-IS". If Purchaser does not elect to terminate this Agreement as provided herein, then: (a) this Agreement will remain in full force and effect, (b) PURCHASER WILL BE DEEMED TO HAVE ACCEPTED THE PROPERTY ON AN "AS IS" BASIS, SUBJECT ONLY TO THE TERMS OF THIS AGREEMENT AND THE TERMS AND CONDITIONS SET FORTH IN THE DOCUMENTS EXECUTED AND DELIVERED BY SELLER AT CLOSING, and (c) Purchaser will be deemed and agreed to accept title to the Property subject to the permitted exceptions listed in the Deed. In the event Purchaser does not

elect to terminate this Agreement, then Seller's sole obligation with respect to the physical condition of the Property will be to deliver possession thereof to Seller in substantially the same physical condition, except as otherwise provided herein, as existed as of the expiration of the Inspection Period. As used in this Agreement, the term "As Is" means, as and where the Property presently exists as of the expiration of the Inspection Period, including, without limitation, all faults, defects, claims, liens, and other conditions of every kind or description with respect to: (a) the physical and environmental condition of the Property, including defects seen and unseen and conditions natural and artificial, (b) the permitted exceptions listed in the Deed, (c) compliance with all laws, ordinances, rules and regulations to which the Property is subject, (d) all claims, demands, actions, or causes of action that relate in any way to the property or the ownership and operation thereof, whether known or unknown, and (e) all other matters related in any way to the ownership and operation of the Property, whether known or unknown, subject to, however, and without limitation of any express terms and provisions of this Agreement and/or the documents to be delivered at Closing.

PURCHASER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, CONCERNING OR WITH RESPECT TO: (A) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY; (B) THE INCOME TO BE DERIVED FROM THE PROPERTY; (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANYONE ELSE MAY CONDUCT THEREON; (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY; (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY; OR (F) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY; AND SPECIFICALLY, EXCEPT AS SET FORTH IN THIS AGREEMENT, THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY DISCLAIMS ANY REPRESENTATIONS REGARDING COMPLIANCE WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION, ZONING OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING THE EXISTENCE IN OR ON THE PROPERTY OF HAZARDOUS MATERIALS. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, HAVING BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PROPERTY, EXCEPT AS SET FORTH IN THIS AGREEMENT, PURCHASER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY SELLER. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED OR TO BE PROVIDED WITH RESPECT TO THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PROPERTY INFORMATION) WAS OBTAINED FROM A VARIETY OF SOURCES AND THAT SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND, EXCEPT AS SET FORTH IN THIS AGREEMENT, MAKES NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OR COMPLETENESS OF SUCH

INFORMATION. EXCEPT AS SET FORTH IN THIS AGREEMENT OR IN ANY DOCUMENT OR INSTRUMENT EXECUTED AND DELIVERED BY SELLER AT CLOSING, SELLER IS NOT LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY ANY REAL ESTATE BROKER, AGENT, EMPLOYEE, SERVANT OR OTHER PERSON. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN "AS-IS" CONDITION AND BASIS "WITH ALL FAULTS". ALL PROVISIONS OF THIS SUBSECTION SHALL SURVIVE CLOSING OR THE TERMINATION OF THIS CONTRACT WITHOUT CLOSING, AS APPLICABLE.

(b)    Hazardous Materials. As stated herein, "Hazardous Materials" shall mean any substance which is or contains (i) any "hazardous substance" as now or hereafter defined in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended (42 U.S.C. § 9601 et. seq.) ("CERCLA") or any regulations promulgated under or pursuant to CERCLA; (ii) any "hazardous waste" as now or hereafter defined in the Resource Conservation and Recovery Act (42 U.S.C. § 6901 et. seq.) ("RCRA") or regulations promulgated under or pursuant to RCRA; (iii) any substance regulated by the Toxic Substances Control Act (15 U.S.C. § 2601 et. seq.); (iv) gasoline, diesel fuel, or other petroleum hydrocarbons; (v) asbestos and asbestos-containing materials, in any form, whether friable or non-friable; (vi) polychlorinated biphenyls; (vii) lead-based paint; (viii) radon gas; and (ix) any additional substances or materials which are now or hereafter classified or considered to be hazardous or toxic under Environmental Requirements (as hereinafter defined) or the common law, or any other applicable laws relating to the Property. Hazardous Materials shall include, without limitation, any substance, the presence of which on the Property, (A) requires reporting, investigation or remediation under Environmental Requirements; (B) causes or threatens to cause a nuisance on the Property or adjacent property or poses or threatens to pose a hazard to the health or safety of persons on the Property or adjacent property; or (C) which, if it emanated or migrated from the Property, could constitute a trespass.

(c)    Environmental Requirements. As used herein "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water or land or soil).

18.    Confidentiality.

(a)    Neither this Agreement nor any notice of it shall be placed of record in the Public Records in Osceola County, Florida or in any other jurisdiction. Should this Agreement or any notice of it be placed of record in violation of this provision, then such action shall be

deemed to be a default hereunder and the non-defaulting Party shall be entitled to exercise the remedies set forth in Section 13 hereof.

(b)    Except as otherwise agreed in writing by the Party not seeking to disclose the Confidential Business Information (as defined below), Purchaser and Seller shall keep all negotiations and matters relating to this Agreement and the transaction, including, without limitation, all information given or obtained by Purchaser during its due diligence review (collectively, "Confidential Information"), strictly confidential; provided, however, that disclosure of Confidential Information may be made: (a) to the extent the same becomes publicly available other than as a result of disclosure by a Party required hereunder to keep matters or information confidential; (b) as required by law, including but not limited to, as a result of a request by any governmental agency or in response to a lawfully issued subpoena or request for production of documents arising out of any litigation proceeding; (c) to each Parties' respective employees, officers, directors, attorneys, accountants, consultants, and/or agents, including but not limited to, such entities as will be necessary to conduct and complete the due diligence provided for in this Agreement, but only to the extent necessary for purposes of completing the transaction and due diligence contemplated under this Agreement, or (d) to any lender or financial institution or financier as may be necessary to obtain financing for the transaction. Subject to the foregoing, until and unless the prior written consent of a Party is obtained, which consent may be withheld for no or any reason whatsoever, the other Party shall not: (i) disclose or reveal, directly or indirectly, any of Confidential Information to any third party, under any circumstances, by any means or for any purpose, (ii) copy, reproduce, retain, transmit, summarize, quote or recreate from memory any such Confidential Information, or (iii) use such Confidential Information for any purpose other than in connection with the closing of this Agreement or the due diligence review of the Property and its operations. The Parties shall also make no press release, public announcement, or other disclosure of the existence of this Agreement or its terms, without the prior written consent of the other Party, which consent may be withheld for no or any reason whatsoever. The Parties shall also cause their employees, officers, directors, attorneys, consultants, agents, and other representatives to fully comply at all times with such confidentiality obligations. Should the transaction contemplated under this Agreement not be consummated for any reason, Purchaser shall immediately return to Seller all (originals and copies of) Property Information provided (or made available) to Purchaser by Seller in connection with due diligence review, including, but not limited to, any and all environmental reports, soils tests, asbestos surveys, and any other engineering studies produced by Seller. In any event, if Purchaser fails to return the due diligence material within three (3) calendar days following the cancellation of the transaction contemplated by this Agreement, Purchaser shall be responsible for any and all costs associated with reproducing the due diligence material. The provisions of this paragraph shall survive the Closing of the transaction contemplated herein.

19.    General Provisions.

(a)    Entire Agreement. This Agreement (including any written amendments hereof executed by the Parties hereto) and Exhibits to this Agreement constitutes the entire agreement and supersedes all prior agreements and understandings, whether oral and written, between the Parties hereto with respect to the subject matter hereof. All of the negotiations, discussions, and agreements between the Parties with regard to the matters described in this

Agreement have been reduced to, merged into, and are incorporated within this Agreement, and each Party acknowledges and agrees that there are no representations, warranties, arguments, agreements, arrangements, undertakings oral or written, between the Parties hereto related to the subject matter of this Agreement which are not fully expressed within this Agreement. The Parties specifically rely upon the terms of this Agreement.

(b)     Assignment; Parties Bound. Purchaser may assign its rights under this Agreement only upon the following conditions: (i) the assignee of Purchaser must be an entity controlling the Purchaser, or controlled by the Purchaser, or under common control with Purchaser, or any entity primarily controlled by or majority owned by either M. Nadeem Battla, Hamida Battla, or Mohammed F. Battla (the "Battlas") or any trust of which any of the Battlas is a trustee or beneficiary; (ii) all of the Deposits must have been delivered in accordance herewith, (iii) the assignee of Purchaser must assume all obligations of Purchaser hereunder, but Purchaser will remain primarily liable for the performance of Purchaser's obligations, (iv) a copy of the fully executed written assignment and assumption agreement will be delivered to Seller at least three (3) business days prior to Closing, and (v) Purchaser's assignee shall be subject to the same representations and warranties as given by Purchaser herein. Any transfer, directly or indirectly, of any stock, partnership interest, or other ownership interest in Purchaser to any person or entity that would not be qualified to be a permitted assignee of Purchaser's interest hereunder without Seller's written approval, which approval may be given or withheld in Seller's sole discretion, will constitute a default by Purchaser under this Agreement. However, notwithstanding anything herein, Purchaser shall be permitted to sell or transfer membership shares of Purchaser so long as the Purchaser is still majority owned by the Battlas or any trust of which any of the Battlas is a trustee or beneficiary. Any assignment or attempted assignment by Purchaser of this Agreement or any rights hereunder which does not satisfy the conditions of the first sentence of this Section 18(b) will be void *ab initio*, of no force or effect and Purchaser will remain fully liable for the performance of its obligations under this Agreement.

(c)     Exculpation of Seller and Related Parties. Notwithstanding anything to the contrary contained in this Agreement or in any exhibits attached hereto or in any documents executed in connection herewith, it is expressly understood and agreed by and between the parties hereto that no personal liability or personal responsibility of any sort with respect to any of Seller's or Purchaser's respective duties or obligations hereunder is assumed by, or shall at any time be asserted or enforceable against the Seller's or Purchaser's respective affiliates, or any of their respective shareholders, directors, officers, employees, agents, advisors, constituent partners, members, beneficiaries, trustees or representatives, except to the extent that such claim is for willful or intentional acts which cause damages to either Party. Nothing within this Section 19(c) shall be deemed or construed as relieving the Seller or Purchaser of their obligations or liability for any breaches of their warranties and representations herein, or defaults of their obligations herein.

(d)     Modifications. No amendment, modification, or alteration of a term or the terms of this Agreement shall be valid or binding unless the same is in writing and executed by the Parties. The Parties hereby release and waive any claim or defense based upon an oral modification of this Agreement including any claim or defense that the Parties orally agreed to modify the requirement that all modifications be in writing.

   (e) <u>Financing</u>. Purchaser acknowledges that its obligations hereunder are not contingent upon the obtaining of financing.

   (f) <u>Time is of the Essence</u>. Time is of the essence for all provisions of this Agreement.

   (g) <u>Calculation of Time Periods</u>. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday, or state or federal legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. Time shall be of the essence with respect to this Agreement. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. Eastern Time. The term "business day" when used in this Agreement means any day other than a Saturday, Sunday, or state or federal legal holiday.

   (h) <u>Interpretation</u>. The following shall apply to the construction and interpretation of this Agreement:

   A. <u>Construction</u>. This Agreement shall be read and interpreted in such a manner as to give all provisions their ordinary and customary meaning and all words, terms, and phrases not otherwise specifically defined by capitalized term or otherwise shall have the same meaning and interpretation as customarily used among lay persons. The terms "hereby", "hereof", "herein", "hereto", "hereunder" and any similar terms refer to this Agreement in its entirety and not solely to the particular section or paragraph in which the term is used. All words, terms, and phrases specifically defined by a capitalized term shall apply throughout this Agreement in its entirety and not solely to the particular section or paragraph in which the term is used. In construing this Agreement, the singular shall be held to include the plural, the plural shall include the singular, and the use of any gender shall include every other and all genders.

   B. <u>Joint Effort</u>. This Agreement was prepared with the joint input of all Parties who each had an opportunity to review and understand the Agreement and have each participated in the preparation of the Agreement which shall not be interpreted more or less favorably to any of the Parties. The Agreement shall not be more strictly construed against one Party than against the other by virtue of the fact that it or they may have been physically prepared by one Party or by its attorneys, as all Parties and their respective attorneys have participated in the negotiation, drafting, and preparation of the Agreement. All terms and provisions of this Agreement shall be deemed to have been inserted for the benefit of all Parties.

   C. <u>Headings</u>. The section and other headings contained in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

D.   Severability. If this Agreement shall contain any one (or more) section, phrase, sentence, term, provision or part of which shall be invalid, against public policy, in violation of any statute or law, is determined by appropriate judicial authority to be illegal or otherwise invalid or if the application of same is invalid, against public policy, or in violation of any statute or law, it shall not be deemed as voiding the entirety of this Agreement, but such provision, term, section, phrase, or part shall be given its nearest legal meaning or be construed as deleted as such authority determines, and the remainder of this Agreement shall be construed to be in full force and effect unless such construction shall cause this Agreement to fail its essential purpose.

E.   Third Parties. Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall be construed to create any duty to, standard of care with respect to, or any liability to any person who is not a party to this Agreement.

F.   Advice of Counsel. The Parties acknowledge that they have received the advice of independent legal counsel or were given the opportunity to obtain the advice of independent legal counsel. Each of the Parties executing this Agreement does so with the full knowledge of its significance and with the express intent of effecting its legal consequences. Each Party shall pay its own legal fees and costs incurred in connection with the negotiation, preparation, and consummation of this Agreement.

(i)   Waiver. The failure by either Party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such Party's right to enforce against the other Party the same or any other such term or provision.

(j)   Governing Law; Venue. This Agreement is being executed and delivered in Osceola County, Florida. This Agreement, and all transactions contemplated hereby, shall be governed by, construed, and enforced in accordance with the laws of the State of Florida, without application of its conflict of laws rules. The Parties herein agree to submit any dispute with regard to or related to this Agreement or the performance thereof or the obligation therein to the personal jurisdiction and exclusive venue of the Ninth Circuit Court of Osceola County, Florida or the County Court for Osceola County, Florida. All terms in this Agreement are enforceable regardless of the inclusion of any specific enforcement or default options or provisions..

(k)   No-Third party Beneficiaries. This Agreement is not intended to give or confer any benefits, rights privileges, claims, actions or remedies to any person or entity as a third party beneficiary.

(l)   Attorneys' Fees. In the event that an action, proceeding, motion, or litigation is commenced or results from or arises out of this Agreement or the performance thereof, the Parties agree that the prevailing Party in such action shall be entitled to recover its reasonable attorney's fees, court costs, and all other expenses from the other Party in all respects including through trial and any appeals (including, without limitation, those incurred preliminary to the institution of any such action or proceeding), and the prevailing Party shall be entitled to recover all attorneys' fees and costs incurred to establish, quantify, collect, or claim its attorneys'

fees and costs. The reasonable costs to which the prevailing Party is entitled shall include costs that are taxable under any applicable statute, rule, or guideline, as well as non-taxable reasonable costs actually incurred, including, but not limited to, costs of investigation, copying costs, electronic discovery costs, telephone charges, mailing and delivery charges, information technology support charges, consultant and expert witness fees, travel expenses, court reporter fees, videographer fees, and mediator fees, regardless of whether or not such costs are otherwise typically taxable by the court as costs, in addition to any other relief to which the prevailing Party may be entitled.

          (m)    Further Assurances. This Agreement is intended to be self-effectuating without the need or requirement for further action by the Parties and shall be binding upon the Parties upon execution, however, in addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by Seller to Purchaser at Closing, Seller agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser. This provision shall survive Closing.

        20.    Radon. Radon is a naturally occurring radioactive gas that, when it is accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Levels of radon that exceed federal and state guidelines have been found in buildings in Florida. Additional information regarding radon and radon testing may be obtained from your county public health unit.

        21.    1031 Exchange. Each of Purchaser and Seller acknowledge that the other Party may be conducting the transaction contemplated by this Agreement for the purpose of entering into an exchange of property of like kind and qualifying use within the meaning of Section 1031 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder. Each Party hereby agrees to cooperate with the other Party, at no cost to the cooperating Party, in the other Party's efforts to affect a like kind land exchange and to perform any and all actions that may be required of the cooperating Party, under Section 1031 of the Internal Revenue Code and regulations promulgated thereunder.

        22.    **Jury Trial Waiver.** THE PARTIES HEREBY WAIVE THEIR RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE ARISING OUT OF OR CONNECTED IN ANY WAY WITH THIS AGREEMENT.

        23.    Counterparts. This Agreement may be executed in any number of counterparts and all so executed counterparts shall constitute one Agreement, which shall be binding upon all Parties hereto, notwithstanding that all Parties' signatures do not appear on the same page, and the Parties further agree that a photocopy, facsimile copy, or other reproduction of this Agreement shall be as binding and effective as the original.

        24.    Effective Date. For purposes hereof, the "Effective Date" of this Agreement shall be the last date executed by the Parties below.

**WHEREFORE**, Purchaser and Seller have caused this Agreement to be executed as of the on the date written herein below.

## [SIGNATURES BEGIN ON THE FOLLOWING PAGE]

**SELLER:**

**VISITORS' PLAZA, INC.,** a Florida corporation

By: _____ Date: _____, 2014

Print Name: _____

As its: _____

**PURCHASER:**

**Treasure Island Real Estate Partners, LLC**

By: _____ Date: 9/29, 2014
M. Nadeem Baxxa, as Manager

Manager is executing this Agreement solely for the purpose of acknowledging its consent to the termination of the Management Agreement pursuant to Section 8(c)(viii) of this Agreement.

**MANAGER:**

**VISITORS' FLEA MARKET, LLC,** a Florida limited liability company

By: _____ Date: _____, 2014

Print Name: _____

As its: _____

**SELLER:**

**VISITORS' PLAZA, INC.,** a Florida corporation

By: Millicent Beth Coban Date: 5/20/2014

Print Name: MILLICENT BETH COBAN

As its: PRESIDENT

**PURCHASER:**

**Treasure Island Real Estate Partners, LLC,** a Florida limited liability company

By: _____ Date: _____, 2014
M. Nadeem Battla, as Manager

Manager is executing this Agreement solely for the purpose of acknowledging its consent to the termination of the Management Agreement pursuant to Section 8(c)(viii) of this Agreement.

**MANAGER:**

**VISITORS' FLEA MARKET, LLC,** a Florida limited liability company

By: Millicent Beth Coban Date: 5/20/2014

Print Name: MILLICENT BETH COBAN

As its: PRESIDENT

## LIST OF EXHIBITS

EXHIBIT A    Legal Description of Real Property

EXHIBIT B    Intentionally Omitted

EXHIBIT C    Intentionally Omitted

EXHIBIT D    Form of Special Warranty Deed

EXHIBIT E    Assignment and Assumption of Personal Property

EXHIBIT F    FIRPTA (Non-foreign) Affidavit

EXHIBIT G    Owner's Affidavit

EXHIBIT H    Assignment and Assumption of Easement

EXHIBIT I    Assignment and Assumption of Leases

EXHIBIT J    Form Tenant Notice Letter

## EXHIBIT A

### LEGAL DESCRIPTION OF REAL PROPERTY

LOT 2 OF XENTURY CITY AS RECORDED IN PLAT BOOK 8, PAGES 40 AND 41 OF THE PUBLIC RECORDS OF OSCEOLA COUNTY, FLORIDA

PARCEL ID NO: 04-25-28-5519-0001-0020

## EXHIBIT D

### FORM OF SPECIAL WARRANTY DEED

PREPARED BY AND RETURN TO:
Andrew Bumby, Esq.
Shutts & Bowen, LLP
300 South Orange Ave., Suite 1000
Orlando, Florida 32801

Note to Recorder: Documentary stamp taxes in the amount of $_____ have been paid to the Osceola County Clerk of Court simultaneously with the recording of this instrument.

### SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED is made and entered into as of this _____ day of _____, 2014 by **VISITORS' PLAZA, INC.,** a Florida corporation, whose mailing address is _____ (hereinafter called the **"Grantor"**), to **Treasure Island Real Estate Partners, LLC, a Florida limited liability company,** whose mailing address is 9502 Lavill Court, Windermere, FL 34786 (hereinafter called the **"Grantee"**).

> [Wherever used herein, the terms "Grantor" and "Grantee" shall include singular and plural, heirs, legal representatives, and assigns of individuals, and the successors and assigns of corporations, wherever the context so admits or requires.]

### W I T N E S S E T H:

The Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other valuable considerations, receipt whereof is hereby acknowledged, by these presents does grant, bargain, sell, alien, remise, release, convey and confirm unto the Grantee, all that certain land situated in Osceola County, Florida (the **"Property"**), as more particularly described on **Exhibit A** attached hereto and incorporated herein by this reference.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

TO HAVE AND TO HOLD, the same in fee simple forever.

AND, the Grantor hereby covenants with the Grantee that it is lawfully seized of the Property in fee simple; that it has good right and lawful authority to sell and convey the Property; and the Grantor hereby covenants that Grantor will warrant and defend title to the Property against the lawful claims of all persons claiming by, through or under Grantor alone, but against none other.

The Property is subject to real property taxes accruing subsequent to December 31, 20__, and matters set forth on **Exhibit B** attached hereto and incorporated herein by this reference (and

identified as permitted exceptions as listed in the Deed); however, this reference shall not serve to reimpose the same.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Grantor has caused these presents to be executed the day and year first above written.

Signed, sealed and delivered
in the presence of:

WITNESSES:

VISITORS' PLAZA, INC., a Florida corporation

Sign: _____
*Witness #1*
Print: _____

By: _____

Print Name: _____

As its: _____

Sign: _____
*Witness #2*
Print: _____

STATE OF _____ )
                                                              ) ss:
COUNTY OF _____ )

I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of VISITORS' PLAZA, INC., on behalf of that company. He [  ] is personally known to me, or [  ] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

_____
NOTARY PUBLIC – signature above
Printed Name:_____

**Exhibit A to Deed**

LEGAL DESCRIPTION

**Exhibit B to Deed**

PERMITTED EXCEPTIONS

## EXHIBIT E

## ASSIGNMENT AND ASSUMPTION OF PERSONAL PROPERTY

THIS ASSIGNMENT AND ASSUMPTION OF PERSONAL PROPERTY (the "**Assignment of Personal Property**") is made as of the _____ day of _____, 2014, by and between **VISITORS' PLAZA, INC., a Florida corporation** ("**Assignor**"), and **Treasure Island Real Estate Partners, LLC, a Florida limited liability company**, a _____ ("**Assignee**").

### WITNESSETH:

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    Assignor hereby sells, transfers, assigns and conveys to Assignee the following:

(a)    All right, title and interest of Assignor in and to all tangible personal property, if any, owned by Seller and located on the real property described in Exhibit "A" attached hereto and incorporated as a part hereof by this reference (the "Land"), and all intangible property related to the Land, to the extent assignable, and any and all other licenses, permits, approvals and rights under utility agreements and similar rights applicable to the Land, including but not limited to (i) all development rights for the Land, or any part thereof, which Assignor has, including, without limitation, those relating to utilities, prepaid water and sewer connection fees, reservation fees but not including impact fees; (ii) all right, title and interest of Assignor in any approved site plans, development plans, development orders or development agreements as they relate to the Land, or any part thereof; (iii) all environmental, water, sewer, drainage, road, excavation, fill and all other construction and development applications, permits, licenses, and rights, contractual or otherwise; (iv) all rights and interests of Assignor under any agreements, with any governmental authorities having jurisdiction over the Land, or any part thereof, relating to flood control, drainage, roads, water or sewer facilities or other infrastructure, construction and development for the Land or any portion thereof; (v) all contracts or agreements related to the Land or services being provided or to be provided to the Property, including, without limitation, agreements with electric, cable, gas, telephone or other utility providers, to the extent assignable, except for the "Excluded Contracts" list on Exhibit "B" attached hereto and incorporated as a part hereof; and (vi) any and all right, title and interest of Seller in any environmental and/or wetlands mitigation relating to the Property, or any portion thereof (collectively, the "Personal Property").

2.    This Assignment of Personal Property is given pursuant to that certain Real Estate Purchase Agreement (as amended, the "**Purchase Agreement**") dated as of _____, 2014, between Assignor and Assignee, providing for, among other things, the conveyance of the Personal Property.

3.    The Personal Property is conveyed by Assignor and accepted by Assignee **AS IS, WHERE IS, WITH ALL FAULTS AND WITHOUT ANY WARRANTIES OF WHATSOEVER NATURE, EXPRESS OR IMPLIED, EXCEPT AS EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT OR IN THIS INSTRUMENT.**

4.    Assignee hereby accepts the assignment of the Personal Property and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations thereunder with respect to the Personal Property to the extent first accruing from and after the date hereof.

5.    This Assignment of Personal Property may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** the Parties hereto have executed this Assignment and Assumption of Personal Property as of the date first above written.

<u>**ASSIGNOR:**</u>

**VISITORS' PLAZA, INC.,** a Florida corporation

By: _____
        Print Name: _____
        As its: _____

STATE OF _____ )
                              ) ss:
COUNTY OF _____ )

    I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of VISITORS' PLAZA, INC., a Florida corporation on behalf of that company. He [__] is personally known to me, or [__] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

                                    _____
                                      NOTARY PUBLIC – signature above
                                      Printed Name:_____

**ASSIGNEE:**

Treasure Island Real Estate Partners, LLC, a Florida
limited liability company,
a _____

By: _____
     Print Name: _____
     As its: _____

STATE OF _____ )
                    ) ss:
COUNTY OF _____ )

    I hereby certify that the foregoing instrument was acknowledged before me this _____
day of _____, 2014, by _____, as the _____
of **Treasure Island Real Estate Partners, LLC, a Florida limited liability company**, a
_____, on behalf of the company. He [ ] is personally known to me, or [ ] has
produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

                           NOTARY PUBLIC – signature above
                           Printed Name:_____

## Exhibit A

## Legal Description of Land

## EXHIBIT F

### FIRPTA Affidavit
### Transferor's Certification of Non-Foreign Status

Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by **VISITORS' PLAZA, INC.**, a Florida corporation (the **"Transferor"**), the undersigned hereby certifies the following on behalf of the Transferor:

1.    Transferor is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and the Income Tax Regulations promulgated thereunder);

2.    Seller is not a disregarded entity as defined in §1.1445-2(b)(2)(iii);

3.    Transferor's U.S. employer identification number is 59-3252534; and

4.    Transferor's office address is 5811 W. Vine Street, Kissimmee, Florida 34746.

Transferor understands that this Certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalty of perjury I declare that I have examined this Certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have authority to sign this document on behalf of Transferor.

Dated: _____

                    **VISITORS' PLAZA, INC.,**
                    a Florida corporation


                    By: _____
                    Print Name: _____
                    As its: _____

## EXHIBIT G

### FORM OF OWNER'S AFFIDAVIT

The undersigned Affiant, being first duly sworn, and being duly authorized to do so on behalf of the Owner named below, hereby makes the following affidavit to _____ ("Title Company") and _____ ("Title Agent") in connection with the transaction identified as follows:

AFFIANT: _____

OWNER:     **VISITORS' PLAZA, INC.**, a Florida corporation

PROPERTY: Real property described in Schedule A to the Commitment set forth below.

COMMITMENT: _____ Title Insurance Commitment # _____.

1.   Owner is the owner in fee simple of the Property, as more particularly described in the Commitment, and to the extent of Affiant's actual knowledge, there are no other Parties who are in possession, or who have or claim a right to be in possession, of any part of Property. There are no rights of refusal or options to purchase all or part of the Property.

2.   (a) No person has, at the request of or on behalf of Owner, furnished any labor, services, or materials in connection with the construction or repair of any buildings or improvements at the Property within the last ninety (90) days; (b) there are no unpaid amounts due for any labor, material, or services commissioned by or on behalf of Owner in connection with the construction or repair of any improvements at the Property, or with respect to the Property itself, that could form the basis of a lien thereon; and (c) Owner has not received any notice of intention to file or record a lien in connection with the Property.

3.   All real estate taxes and municipal or county charges currently due and owing with respect to the Property have been paid, or will be paid prior to the date on which same will become delinquent.

4.   As an inducement to Title Company and Title Agent to insure over any matters attaching or created during the "gap" in time between the last continuation of title and the recording of the appropriate deed, mortgage, or other instrument with respect to the Property, Owner shall promptly remove of record any matters filed of record during said gap period, but only to the extent caused by Owner or any Party claiming by, through, or under Owner.

5.   This Affidavit is given with the understanding and intention that Title Company and Title Agent shall rely on the truth and accuracy of the statements made herein in issuing the title insurance policy which is based on the Commitment, and Owner shall indemnify and hold harmless Title Company and Title Agent against liability occasioned by reason of reliance upon the statements made herein; provided, however, in no event shall Affiant have any personal liability hereunder, and in no event shall any liability to Owner arising

hereunder exceed the face amount of any policy of title insurance issued in connection with this Affidavit.

Executed as of the _____ day of _____, 2014.

AFFIANT:

_____

STATE OF _____ )
                                 ) ss:
COUNTY OF _____ )

I hereby certify that the foregoing instrument was sworn and subscribed to before me this _____ day of _____, 2014, by _____. He [__] is personally known to me, or [__] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

NOTARY PUBLIC – signature above
Printed Name:_____

## EXHIBIT H

*THIS INSTRUMENT PREPARED BY*
*AND AFTER RECORDING RETURN TO:*

Andrew Bumby, Esquire
Shutts & Bowen LLP
300 South Orange Avenue
Suite 100
Orlando, Florida 32801

## ASSIGNMENT AND ASSUMPTION OF EASEMENT

THIS ASSIGNMENT AND ASSUMPTION OF EASEMENT (the "**Assignment**") is made as of the _____ day of _____, 2014, (the "**Effective Date**") by and between **VISITORS' PLAZA, INC.**, a Florida corporation, whose mailing address is _____ ("**Assignor**"), and **Treasure Island Real Estate Partners, LLC, a Florida limited liability company, a** _____, whose address is _____ ("**Assignee**").

### RECITALS

WHEREAS, Assignor is the owner of certain property located in Osceola County, Florida, as more particularly described and depicted on the attached **Exhibit "A"** (the "**Property**"); and

WHEREAS, Assignor is the grantee under that certain Easement recorded March 16, 2000 in Official Records Book 1714, Page 2557 of the Public Records of Osceola County, Florida (the "**Easement**") pursuant to which Assignor has been granted certain rights of access and use of property adjacent to the Property; and

WHEREAS, on the Effective Date, Assignor has conveyed title to the Property to Assignee by Special Warranty Deed, and the provisions of the Easement are binding upon and inure to Assignor's respective successors and assigns; and

WHEREAS, Assignor desires to assign to Assignee, and Assignee desires to accept, all of Assignor's right, title and interest in the Easement.

**NOW, THEREFORE,** for good and valuable consideration ,the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.  Recitals. The foregoing recitals are true and correct, and are hereby incorporated by reference into this Assignment.

2.    Assignment; Acceptance. By its execution of this Assignment, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title, interest, obligation, benefits and burdens as the grantee under the Easement. By its execution of this Assignment, Assignee hereby accepts all of Assignor's right, title, interest, obligation, benefits and burdens under the Easement. Assignee further agrees to assume and discharge, in accordance with the terms of the Easement, all of Assignor's obligations with respect to the Easement. Assignee shall hold harmless and indemnify Assignor for any alleged breach of the obligations under the Easement alleged against Assignor arising from and after the Effective Date.

3.    Counterparts. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original but all of which shall constitute one Assignment.

[Space intentionally left blank – signatures follow]

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the Effective Date first written above.

**ASSIGNOR:**

**VISITORS' PLAZA, INC.,** a Florida corporation

By: _____
          Print Name: _____
          As its: _____

STATE OF _____    )
                                                                 ) ss:
COUNTY OF _____    )

I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of VISITORS' PLAZA, INC., a Florida corporation on behalf of that company. He [__] is personally known to me, or [__] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

                                                          _____
                                                          NOTARY PUBLIC – signature above
                                                          Printed Name: _____

**ASSIGNEE:**

**Treasure Island Real Estate Partners, LLC, a Florida limited liability company,**

a _____

By: _____
    Print Name: _____
    As its: _____

STATE OF _____ )
                   ) ss:
COUNTY OF _____ )

    I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of **Treasure Island Real Estate Partners, LLC, a Florida limited liability company,** a _____, on behalf of the company. He [__] is personally known to me, or [__] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

        _____
        NOTARY PUBLIC – signature above
        Printed Name:_____

Exhibit A to Assignment of Easement

LEGAL DESCRIPTION OF PROPERTY

## EXHIBIT I

## ASSIGNMENT AND ASSUMPTION OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (the "**Assignment of Lease**") is made as of the _____ day of _____, 2014 (the "**Effective Date**"), by and between **VISITORS' PLAZA, INC., a Florida corporation** ("**Assignor**"), and **Treasure Island Real Estate Partners, LLC, a Florida limited liability company, a** _____ ("**Assignee**").

## W I T N E S S E T H:

For good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.      "Property" means the real property located in Osceola County, Florida commonly known as Visitors' Plaza together with the buildings, structures, and other improvements located thereon.

2.      "Leases" means those leases, tenancies, rental agreements, and occupancy agreements affecting the Property which are described in Exhibit "A" attached to this Assignment of Leases.

3.    4.      Assignor hereby sells, transfers, assigns and conveys to Assignee all right, title and interest of Assignor in and to the Leases.

2.      This Assignment of Leases is given pursuant to that certain Real Estate Purchase Agreement dated as of _____, 2014, between Assignor and Assignee, providing for, among other things, the conveyance of Assignor's right, title and interest in and to the Leases.

3.      Assignee hereby accepts the assignment of the Leases and agrees to assume and discharge, in accordance with the terms thereof, all of the obligations thereunder with respect to the Leases to the extent first accruing from and after the date hereof. Assignee shall hold harmless and indemnify Assignor for any alleged breach of the obligations under the Leases alleged against Assignor arising from and after the Effective Date.

4.      This Assignment of Leases may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have executed this Assignment and Assumption of Leases as of the date first above written.

### ASSIGNOR:

VISITORS' PLAZA, INC., a Florida corporation

By: _____
       Print Name: _____
       As its: _____

STATE OF _____ )
                           ) ss:
COUNTY OF _____ )

I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of VISITORS' PLAZA, INC., a Florida corporation on behalf of that company. He [ ] is personally known to me, or [ ] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

_____
NOTARY PUBLIC – signature above
Printed Name:_____

**ASSIGNEE:**

**Treasure Island Real Estate Partners, LLC, a Florida limited liability company,**

a _____

By: _____
      Print Name: _____
      As its: _____


STATE OF _____ )
                                                        ) ss:
COUNTY OF _____ )


      I hereby certify that the foregoing instrument was acknowledged before me this _____ day of _____, 2014, by _____, as the _____ of **Treasure Island Real Estate Partners, LLC, a Florida limited liability company,** a _____, on behalf of the company. He [__] is personally known to me, or [__] has produced _____ as identification.

*Affix Notary Stamp or Seal Below:*

 

                                      _____
                                        NOTARY PUBLIC – signature above
                                        Printed Name:_____

Exhibit A

Leases

## EXHIBIT J

## Form Tenant Notice Letter

## AMENDMENT TO
## REAL ESTATE PURCHASE AGREEMENT

WHEREAS, **Visitors' Plaza, Inc.,** a Florida corporation ("Seller"), and **Treasure Island Real Estate Partners, LLC,** a Florida limited liability company ("Purchaser") entered into a **Real Estate Purchase Agreement** effective as of September 29, 20014 (the "Agreement");

WHEREAS, the Agreement called for a due diligence Inspection Period of sixty days which was to expire on November 28, 2014, and which was amended to expire on December 8th, 2014;

WHEREAS, the Parties have agreed to extend the Inspection Period;

NOW THEREFORE, for and in consideration of the covenants, terms, and agreements set forth herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby expressly acknowledged by the parties hereto, Purchaser and Seller hereby covenant and agree to enter into this Amendment to Real Estate Purchase Agreement ("Amendment") as follows:

1.    The Inspection Period and all rights thereunder shall and is hereby extended to and through December 15th, 2014.

2.    All other terms and conditions of the Agreement shall continue in full force as is without amendment or modification. All defined terms in the Agreement have the same meaning herein.

3.    This Amendment may be executed in any number of counterparts and all so executed counterparts shall constitute one Amendment, which shall be binding upon all Parties hereto, notwithstanding that all Parties' signatures do not appear on the same page, and the Parties further agree that a photocopy, facsimile copy, or other reproduction of this Amendment shall be as binding and effective as the original. This Amendment shall be made part of and incorporated into the terms of the Agreement.

WHEREFORE, Purchaser and Seller have caused this Amendment to be executed as of the on the dates written herein below.

**SELLER:**      **VISITORS' PLAZA, INC.,** a Florida corporation

By: _____      Date: December 5, 2014

Print Name: M. Beth Coban

As its: _____

**PURCHASER:** Treasure Island Real Estate Partners, LLC, a Florida limited liability company

By: _____      Date: December 8, 2014
M. Nadeem Battla, as Manager

### AMENDMENT TO
### REAL ESTATE PURCHASE AGREEMENT

WHEREAS, **Visitors' Plaza, Inc.,** a Florida corporation ("Seller"), and **Treasure Island Real Estate Partners, LLC,** a Florida limited liability company ("Purchaser") entered into a **Real Estate Purchase Agreement** effective as of September 29, 20014 (the "Agreement");

WHEREAS, the Agreement called for a due diligence Inspection Period of sixty days which expires on November 28, 2014;

WHEREAS, the Parties have agreed to extend the Inspection Period;

NOW THEREFORE, for and in consideration of the covenants, terms, and agreements set forth herein, and other good and valuable consideration, the receipt, adequacy, and sufficiency of which are hereby expressly acknowledged by the parties hereto, Purchaser and Seller hereby covenant and agree to enter into this Amendment to Real Estate Purchase Agreement ("Amendment") as follows:

1.    The Inspection Period and all rights thereunder shall and is hereby extended to and through December 8, 2014.

2.    All other terms and conditions of the Agreement shall continue in full force as is without amendment or modification. All defined terms in the Agreement have the same meaning herein.

3.    This Amendment may be executed in any number of counterparts and all so executed counterparts shall constitute one Amendment, which shall be binding upon all Parties hereto, notwithstanding that all Parties' signatures do not appear on the same page, and the Parties further agree that a photocopy, facsimile copy, or other reproduction of this Amendment shall be as binding and effective as the original. This Amendment shall be made part of and incorporated into the terms of the Agreement.

WHEREFORE, Purchaser and Seller have caused this Amendment to be executed as of the on the dates written herein below.

**SELLER:**    VISITORS' PLAZA, INC., a Florida corporation

By: _____  Date: November 26, 2014

Print Name: _____

As its: _____

**PURCHASER:**    Treasure Island Real Estate Partners, LLC, a Florida limited liability company

By: _____  Date: November 26, 2014
M. Nadeem Battla, as Manager